# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

HARRY JONES,

      Petitioner,

v.                                        CASE NO. 4:09cv54-RH/WCS

WALTER McNEIL,

      Respondent.

_____/

## ORDER DENYING THE PETITION

By petition for a writ of habeas corpus under 28 U.S.C. § 2254, Harry Jones

challenges his state-court convictions and death sentence. The convictions were

for robbing and murdering George Young and stealing his truck.

Mr. Jones challenges the convictions and sentence on multiple grounds.

The most significant are these. First, Mr. Jones complains about a witness who

testified that Mr. Jones admitted committing the crimes. Mr. Jones says the State

failed to disclose impeaching information about the witness and that after the trial

the witness recanted. Second, Mr. Jones says his attorney introduced some

mitigating evidence but rendered ineffective assistance by failing to introduce more, including mental-health evidence.

This order rejects all of Mr. Jones's claims and denies the petition. The order sets out the essential facts in section I, summarizes the state-court proceedings in section II, sets out the standard of review in section III, and addresses Mr. Jones's claims in sections IV through XV. The order does not address the claims in the sequence in which Mr. Jones asserts them; instead, the order starts with issues relating to guilt or innocence and then turns to sentencing.

## I

The State's theory of the case, fully supported by the evidence, was this. Mr. Jones was in a liquor store with a friend, Timothy Hollis, who became ill. Mr. Jones saw Mr. Young make a purchase and thus knew that Mr. Young had cash. Mr. Young helped Mr. Jones take Mr. Hollis outside, and Mr. Young agreed to drive both men home. After dropping off Mr. Hollis at his home, Mr. Young and Mr. Jones went not to Mr. Jones's home but to Boat Pond. There Mr. Jones robbed, savagely beat, and drowned Mr. Young. Mr. Jones left in Mr. Young's truck.

Substantial evidence supported this theory. Several witnesses saw the three men leave the liquor store in Mr. Young's truck. Mr. Hollis's mother saw Mr. Hollis arrive home in the truck together with Mr. Jones and a man meeting Mr.

Young's description. A short while later, a convenience-store clerk saw Mr. Jones and Mr. Young together. A short time after that, Mr. Jones had a wreck while driving Mr. Young's truck; Mr. Young was not there. An officer interviewed Mr. Jones, who said he paid $20 to borrow the truck from an African-American man in a different part of town. Mr. Young was white.

The evidence that Mr. Young was beaten and drowned came from the medical examiner. Mr. Young had substantial defensive wounds, including a fractured forearm with protruding tendons, chest fractures, and a cheek injury accompanied by a nearly severed ear lobe. These injuries did not cause Mr. Young's death; the cause of death was drowning.

Additional evidence came from two men who shared a cell with Mr. Jones after his arrest. The first, Kevin Prim, testified that Mr. Jones said he met a man at a liquor store and convinced the man to provide a ride home for Mr. Jones and his cousin, that at a pond Mr. Jones attempted to rob the man, that they fought, and that Mr. Jones broke the man's arm before holding him under the water until he stopped moving. The second cellmate, Jay Watson, testified that he heard Mr. Jones tell Mr. Prim that he committed the murder.

## II

In Florida death cases, the jury first determines guilt or innocence. If the defendant is convicted of a charge that could result in a death sentence, the trial

moves to a penalty phase, at which each side may present additional evidence. The jury makes a recommendation on whether the sentence should be death or life in prison. The recommendation need not be unanimous. The judge considers the jury's recommendation and determines the sentence. If the judge sentences the defendant to death, any appeal lies directly to the Florida Supreme Court.

Here the jury convicted Mr. Jones of first-degree murder (as well as robbery and grand theft of a motor vehicle). The jury recommended a death sentence (on the murder conviction) by a 10-2 vote. The judge sentenced Mr. Jones to death.

Mr. Jones appealed. The Florida Supreme Court affirmed. Mr. Jones collaterally attacked the convictions and sentence in state court through a variety of proceedings. The state postconviction court, and ultimately the Florida Supreme Court, denied relief.

## III

Mr. Jones filed this federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act. The Act therefore applies. *See, e.g.*, *(Michael) Williams v. Taylor*, 529 U.S. 420, 429 (2000) ("Petitioner filed his federal habeas petition after AEDPA's effective date, so the statute applies to his case.") (citing *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997)).

Under the Act, a federal habeas court may set aside a state court's ruling on the merits of a petitioner's claim only if the ruling "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or if the ruling "was based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A long line of cases

addresses these standards.  *See, e.g.*, *(Terry) Williams v. Taylor*, 529 U.S. 362, 396

(2000); *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, (11th Cir. 2012).  Well-

settled standards also govern review when a state court does not reach the merits.

No purpose would be served by repeating here all the analysis set out in the many

cases.

## IV

Mr. Jones makes two assertions related to the testimony of his cellmate Mr.

Prim.  First, Mr. Jones asserts the State failed to turn over evidence about Mr. Prim

before the trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio

v. United States*, 405 U.S. 150 (1972).  Second, Mr. Jones asserts that Mr. Prim

later recanted his testimony—to private individuals, not to the court—and that this

requires a new trial.  Mr. Jones makes no similar claims about the other cellmate,

Mr. Watson, who corroborated the most important part of Mr. Prim's testimony.

## A

"To prevail on a *Brady* claim, [a] petitioner must establish '(1) the

government possessed evidence favorable to him; (2) the defendant did not possess

the evidence and could not have obtained it with reasonable diligence; (3) the

government suppressed the favorable evidence; and (4) the evidence was

material.' " *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir. 2009)

(quoting *Davis v. Terry*, 465 F.3d 1249, 1254 (11th Cir. 2006)).  For this purpose,

"[e]vidence is material if there is a reasonable probability that a different result

would have occurred had the evidence been disclosed" to the defense.  *Id.* (citing

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).  A "reasonable probability" is "shown

when the government's evidentiary suppression 'undermines confidence in the

outcome of the trial.' "  *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*,

473 U.S. 667, 678 (1985)); *see also Lamarca*, 568 F.3d at 941..

       To prevail on a "*Giglio* claim, a petitioner 'must establish that (1) the

prosecutor knowingly used perjured testimony or failed to correct what he

subsequently learned was false testimony; and (2) such use was material . . . .' "

*Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1208 (11th Cir. 2009)

(quoting *Davis*, 465 F.3d at 1253).  Because of the prosecutor's greater culpability,

materiality is a lower standard under *Giglio* than under *Brady*.  Evidence is

material under *Giglio* if "there is any reasonable likelihood that the false testimony

could have affected the judgment of the jury." *Ventura v. Attorney Gen., Fla.*, 419

F.3d 1269, 1279 & n.4 (11th Cir. 2005).

## B

Mr. Jones asserts that the State violated *Brady* and *Giglio* by failing to disclose to the defense that Mr. Prim had been offered a deal: release in his own pending grand-theft case in exchange for his testimony against Mr. Jones.  The short answer is that the state postconviction court found as a fact that no deal existed.  The Florida Supreme Court upheld the finding.

The finding was supported by the testimony of the prosecutor and the relevant law enforcement officer at the postconviction hearing as well as the testimony of Mr. Prim and the officer at the trial.  In opposition to that explicit testimony, Mr. Jones offered only speculation and the fact that Mr. Prim was released after he testified.  That a witness obtains favorable treatment in his own case after he testifies of course does not establish that there was an agreement in advance requiring the State to provide the favorable treatment.

The postconviction court's finding—as upheld by the Florida Supreme Court—that there was no deal was not an unreasonable determination of the facts in light of the evidence.  Mr. Jones is not entitled to relief on this claim.

## C

Mr. Jones says the State violated *Brady* and *Giglio* in another respect as well.  Mr. Prim was arrested on new charges after he testified, after the jury returned the guilty verdict, and after the jury recommended death.  But the arrest

occurred on the day *before* the judge sentenced Mr. Jones to death. The arrest

arose from a series of burglaries, and, at the time of the arrest, Mr. Prim possessed

a crack pipe.

At the time of sentencing, the prosecutor did not know about the arrest, but

Mr. Prim's arresting officer obviously knew, and Mr. Jones says the knowledge

must be imputed to the State, based on *Kyles v. Whitley*, 514 U.S. 419 (1995).

*Kyles* attributed information to the state, but the information dealt with the crime at

issue and was known to officers working on the case. *Kyles* did not suggest

information could be attributed to the state even if the information was known only

to a law enforcement officer not involved in the case and dealt only with possible

impeachment of a witness whose testimony was complete and indeed who testified

only to a jury that had already returned its verdict.

The Florida Supreme Court rejected the claim, holding that the information

could not be imputed to the State and that in any event the information was not

material. The court was correct on both counts.

A prosecutor has no reason, on the eve of sentencing, to go back and look

for new impeaching information about a witness who testified during the trial.

Any suggestion that information about Mr. Prim's arrest should have found its way

to the prosecutor is wholly unrealistic. And the suggestion that providing this

information to the defense on the day before sentencing would have made a

difference—would or even might have affected the judge's decision to impose the death penalty—is even further afield.  Mr. Prim was thoroughly cross-examined at the trial about his five prior convictions and his pending grand-theft charge.  One more arrest, or an indication that at some point Mr. Prim smoked crack, would not have mattered to the sentencing judge.

The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.  Mr. Jones is not entitled to relief on this claim.

## D

Years later, Mr. Jones says he came across new evidence—evidence that Mr. Prim told two individuals that he testified falsely, both by implicating Mr. Jones in the crime and by denying that Mr. Prim had a deal for favorable treatment in his own case in exchange for the testimony against Mr. Jones.

The Florida Supreme Court held that even if the claim was timely, Mr. Jones was not entitled to relief, because the "newly discovered evidence is merely impeachment evidence directed at a witness who was significantly impeached at trial."  *Jones v. State (Jones III)*, 53 So. 3d 230, 2010 WL 4261400, at *1 (Fla. 2010) (unpublished disposition).

Even without the added layer of deference provided by AEDPA, recantation evidence of this kind does not ordinarily entitle a defendant to relief. The standard for newly discovered evidence (applied to a recantation claim) is this:

> (1) the evidence must be newly discovered and have been unknown to the defendant at the time of trial; (2) the evidence must be material, and not merely cumulative or impeaching; (3) the evidence must be such that it will probably produce an acquittal; and (4) the failure to learn of such evidence must be due to no lack of diligence on the part of the defendant.

*United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988).

Here the proffered new evidence is merely impeaching. That is so because Mr. Jones proffers only the testimony of the two individuals who say Mr. Prim recanted *to them*. Mr. Jones acknowledges that Mr. Prim himself will not testify contrary to his original testimony implicating Mr. Jones and denying any deal. *See* Successive Postconviction Mot. Hrg. Tr. at 11-12, 24 (Tab 14). So if a new trial was ordered, Mr. Prim would again be available to implicate Mr. Jones, and the only change from the original trial would be additional impeachment—testimony that Mr. Prim told the two new witnesses that his testimony was false.

Recantations are sometimes true but often not; they are notoriously untrustworthy. And when a witness who recants later recants the recantation, the untrustworthiness increases exponentially.

If Mr. Prim recanted to the two individuals at all—a proposition that I accept as true for purposes of this order—he now no longer stands by the recantation. The case is thus much like cases dealing with recanted recantations.

The Eleventh Circuit has said that when a witness recants a recantation, the recantation is not newly discovered evidence. *See United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995) ("This court has held that a retraction of an earlier recantation of trial testimony does not qualify as newly discovered evidence."); *Santiago*, 837 F.2d at 1550 (labeling a new-evidence claim "strained" because the witness "retracted his recantation").

And even an unrecanted recantation does not necessarily entitle a defendant to relief. Courts properly view recantations with "extreme suspicion." *Santiago*, 837 F.2d at 1550. Justice Brennan put it this way: "Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting). The Eleventh Circuit quoted Justice Brennan's views favorably in *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009).

Moreover, even when a recantation is credible, a new trial is not required if the evidence would not "result in a change in the verdict." *Puentes*, 50 F.3d at 1578.

The Florida Supreme Court held that, even if Mr. Prim told the two individuals that he testified falsely and even if the claims based on that information were timely, Mr. Jones was not entitled to relief, because the information was merely impeaching and would not have affected the outcome. Mr. Jones has cited no United States Supreme Court decision that is inconsistent with this reasoning. The Florida Supreme Court's decision was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

## V

Mr. Jones asserts one additional *Brady* violation. After the trial, Mr. Jones obtained two pages of handwritten notes. The notes refer to the Florida Highway Patrol trooper who investigated Mr. Jones's traffic crash. The notes also include this statement: "Wit saw V driving earlier in evening, obviously DUI, @ 6 p.m." Mr. Jones says "Wit" means the trooper, "V" means the victim Mr. Young, and that Mr. Young's intoxication explains why, at the time of the crash, Mr. Jones was driving Mr. Young's truck. It is not much of an explanation; Mr. Jones was himself quite drunk, and by the time of the crash, Mr. Young was dead.

The Florida Supreme Court rejected this claim on procedural grounds and also on the merits. The rejection on the merits was plainly correct. The notes are unauthenticated. Even now, Mr. Jones has proffered no admissible evidence that he turned up based on the notes. And even if the notes could somehow be admitted to prove what Mr. Jones say they prove—that Mr. Young was driving drunk earlier in the evening—it would make no difference. At most, the notes show that Mr. Young was willing to drive drunk. That hardly suggests he would willingly turn over his truck to someone who was himself drunk.

If the State had the notes, it should have turned them over. But the notes are neither exculpatory nor material within the meaning of *Brady*. On any view of the evidence, the first contact between Mr. Jones and Mr. Young was after 6:00. That Mr. Young drove the truck before that is unremarkable. And that he was drunk—if he was—also proves nothing of significance.

## VI

Mr. Jones asserts he was shackled during jury selection in view of the prospective jurors, thus denying a fair trial, and that his attorney rendered ineffective assistance by failing to object. The judge who handled postconviction matters at the trial level was also the judge who presided over the jury selection and the remainder of the trial. The judge said unequivocally that Mr. Jones was not shackled.

The judge—the postconviction court—also ruled that the shackling claim was procedurally defaulted because it was not made on direct appeal and that the ineffective-assistance claim was an improper attempt to avoid the procedural default. The Florida Supreme Court affirmed on a different ground—that Mr. Jones has not shown prejudice. The Eleventh Circuit has upheld a similar ruling in somewhat different circumstances. *See Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1313-14 (11th Cir. 2005). This order reaches the same result but on a different basis.

A presiding judge can make a statement on the record that itself constitutes part of the record of the proceeding. Had the judge said on the record at the trial, "Let the record reflect that Mr. Jones is present and unshackled," that would constitute part of the record. But in the absence of an objection or contrary indication, a trial judge rarely makes a statement of that kind; there is no need for it. Here, when the issue was broached for the first time during postconviction proceedings, the trial judge made a record, saying clearly and unequivocally that Mr. Jones was not shackled. There is absolutely no basis for any assertion that the judge failed to make an accurate record.

The shackling claim is unfounded because the record establishes that Mr. Jones was not shackled. The presiding judge's statement during the postconviction

hearing was as much a part of the record as it would have been if made contemporaneously during the trial itself.

A contrary holding might require an evidentiary hearing each time a death-sentenced prisoner—or for that matter any other prisoner—was willing to swear, or even allege, that he had been shackled. Or willing to swear or allege he was tried in prison garb, or made to sit in the corner, or that the judge or jurors sometimes left the courtroom during the trial. A contrary holding might even allow hearings much more broadly. If the judge cannot be trusted to make a record, it is unclear why the court reporter should be trusted. If a defendant is willing to swear or allege that the court reporter's transcript is inaccurate, must we have a hearing and call witnesses to prove what was actually said in the transcribed hearing? Surely not. In the absence of a basis to doubt the record, an unsupported assertion that the record is inaccurate is ordinarily not enough to require a hearing.

Because the record shows that Mr. Jones was not shackled, this claim fails on the merits, even if considered in this court de novo. This makes it unnecessary to decide whether the Florida Supreme Court's prejudice analysis was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

## VII

Mr. Jones was hospitalized following the crash on the night of the murder. Hospital personnel collected Mr. Jones's clothes and personal property for safekeeping. Officers obtained the clothes and personnel property from the hospital without a warrant. The trial court denied a motion to suppress. The Florida Supreme Court held that the Fourth Amendment was violated but that the erroneous admission of the evidence was harmless.

Mr. Jones claims that the harmless-error conclusion was wrong.

The short answer is that when a state court affords a defendant a full and fair opportunity to litigate a claim that evidence should be excluded under the Fourth Amendment, the state court's ruling is not reviewable on a federal habeas petition. *See Stone v. Powell*, 428 U.S. 465 (1976); *see also Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987).

Mr. Jones acknowledges this but asserts that *Stone* was wrongly decided. Mr. Jones has preserved the issue by asserting it but plainly is not entitled to relief in this court. *Stone* is binding.

## VIII

Mr. Jones asserts that gruesome photographs of Mr. Young's body were admitted in violation of the Due Process Clause. The trial court admitted some photographs, not others. The photographs themselves are not in this record, but the

information in the record suggests that the photographs were relevant and that their admission was within the trial court's broad discretion.

On direct appeal, the Florida Supreme Court rejected the claim that the photographs were improperly admitted. The court said the photographs were relevant to demonstrate how the body was recovered and to assist the medical examiner's testimony.

It is likely that the photographs were properly admitted and that there was no Due Process violation. But that issue need not be addressed here. Mr. Jones raised the photograph issue in state court only as a state evidentiary issue, not as a Due Process issue. A federal petitioner cannot pursue a Due Process claim when the underlying issue was raised in state court only as a state evidentiary issue without asserting a federal constitutional issue. *See, e.g.*, *Hartge v. McDonough*, 210 F. App'x 940, 943 (11th Cir. 2006) (rejecting a gruesome-photograph claim on this basis).

IX

Mr. Jones says the prosecutor made three improper remarks during closing argument, and that Mr. Jones's attorney rendered ineffective assistance by failing to object.

A

The first remark was this:

> We do not know how [Mr. Jones] persuaded George Young to drive
> him . . . to Boat Pond. And that's one of those questions . . . we are
> simply never going to be able to answer *because only two people*
> *know how he talked him into that. Only two people know and one of*
> *them is dead.* I've got a couple theories, but they are theories.

Trial Tr. 846:16-23 (Tab J). Had the prosecutor left out the italicized portion of

this remark, it would have been unobjectionable.

Mr. Jones exercised his constitutional right not to testify during the trial's

guilt-or-innocence phase. Under settled law, the prosecutor was not free to

comment on Mr. Jones's silence. *See, e.g.*, *Johnson v. United States*, 318 U.S. 189,

198 (1943).

Whether the italicized portion of the quoted remark was an improper

comment on silence may be unclear. "The standard for determining whether there

has been an improper comment upon a defendant's right not to testify at trial is

whether the statement was manifestly intended or was of such a character that a

jury would naturally and necessarily take it to be a comment on the failure of an

accused to testify." *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir. 1984) (internal

quotation marks omitted). "In applying this test, the court must look to the context

in which the statement was made in order to determine the manifest intention

which prompted it and its natural and necessary impact upon the jury." *Id.*

(internal quotation marks omitted). I assume, for purposes of this order, that the

italicized portion of the remark was an improper comment on Mr. Jones's decision not to testify.

An improper comment on a defendant's right to remain silent is subject to harmless-error review. *See, e.g.*, *Hill v. Turpin*, 135 F.3d 1411, 1417 (11th Cir. 1998); *Matire v. Wainwright*, 811 F.2d 1430, 1436 (11th Cir. 1987); *United States v. Meneses-Davila*, 580 F.2d 888 (5th Cir. 1978). And a claim that an attorney rendered ineffective assistance by failing to object to such a remark, like any ineffective-assistance claim, requires a showing of both deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Factors that courts have considered in determining whether a comment on silence was harmful or prejudicial include the comment's context in the trial, whether the comment was repeated or linked to a defendant's exculpatory story, and the strength of the evidence of the defendant's guilt. *See, e.g.*, *Mattire*, 811 F.2d at 1436; *Hill*, 135 F.3d at 1417.

Here the prosecutor's remark was brief; it was never repeated; and it did not relate to a significant issue in the context of the trial as a whole. The evidence of guilt was strong. The remark made no difference. The Florida Supreme Court's rejection of this claim was correct.

B

The second remark was this:

I think what you have just experienced may be best referred to as a shotgun of the imagination defense. *It is not truly a defense. It's a distraction. In this case I hope an attempt to distract you.* You see, when you sit up here or stand up here, rather and argue about whether or not Mike Woods told Harry Jones that the man was missing, what does that have to with why Harry Jones was lying to him about the truck? What effect would that have one way or the other?

Trial Tr. 905:15-24 (Tab L).

Mr. Jones says the italicized part of this remark was improper. It was not. It was simply argument. Labeling an opponent's argument a distraction is hardly improper. *See, e.g.*, *United States v. Jackson*, 215 F. App'x 918, 924 n.4 (11th Cir. 2007) (finding "no error with respect to the prosecutor's comment that 'the defense would like to blow a lot of smoke and shine a lot of light . . . .' ").

And there was nothing prejudicial or misleading or confusing about this remark. A jury can be trusted to evaluate such a remark on the merits, deciding for itself whether the defense or prosecution has the better of the argument. This is, in short, the stuff of which jury trials are made.

The Florida Supreme Court's rejection of this claim was correct.

## C

The third remark was this:

None of us here knows when our time is going to get cut short by an accident or disease. But to have it stolen from us for money, out of boredom, stolen from us by a deliberate and cruel act, the life of this Defendant is no doubt precious to him, but this terrible crime, when you view the aggravating circumstances, requires the most terrible penalty. Does this diminish us, does this make us less, does this

reduce us or lower us to the level of someone who goes out and deliberately takes a life? No. *No, because the difference between murder and self defense, between crime and punishment, is all the difference in the world.* We do not do this, we do not ask you to do this out of vengeance or anger.

Trial Tr. 986:16-987:5 (Tab Q).

Mr. Jones says the reference to self defense was a suggestion that executing Mr. Jones would be an act of self defense—that if sentenced to life in prison, Mr. Jones would pose a threat to kill again, making a death sentence an act of defense from future harm. The Florida Supreme Court assumed the remark was objectionable and that Mr. Jones's attorney rendered ineffective assistance by failing to object, but the court concluded that Mr. Jones suffered no prejudice.

If the remark was objectionable, it was objectionable as a matter of state law. Nothing about the remark was unconstitutional. The inescapable truth is that killing is sometimes a crime and sometimes not. Imposing the death penalty is not a crime. A prosecutor may point this out in closing. Good lawyers often address a jury's possible biases against their positions. This prosecutor could have chosen the words more carefully, but the remark was not unconstitutional.

Violations of state law are not a basis for relief in a federal habeas proceeding. Ineffective assistance of course is a constitutional violation, but failing to object to a remark like this is hardly ineffective. Most good trial lawyers would let this remark pass quickly and quietly rather than rising to object.

More importantly, the Florida Supreme Court's conclusion that this remark caused no prejudice was plainly correct. This was an isolated remark in a long trial. The suggestion that the remark was interpreted by the jury as Mr. Jones now suggests and had an improper effect on the jury's verdict is fanciful.

D

In sum, the prosecutor's three challenged remarks, considered individually or as a group, had no effect on the verdict. Mr. Jones's attorney did not render ineffective assistance by failing to object. And had he objected, regardless of whether the objection would have been sustained or overruled, it would not have mattered. This was a tiny part of a trial that focused on other things. The Florida Supreme Court's rejection of this claim was correct and even more clearly was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

X

At the penalty phase, Mr. Jones presented his own testimony and his sister's. They testified about Mr. Jones's difficult family background. Mr. Jones asserts that his attorney rendered ineffective assistance by failing to present mental-health evidence and by failing to present additional family-background evidence.

A

To prevail on an ineffective-assistance claim, a petitioner must show two things: deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Performance is deficient only if it falls " 'below an objective standard of reasonableness' in light of 'prevailing professional norms' at the time the representation [takes] place." *See, e.g., Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240 (11th Cir. 2010) (quoting *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009)). Because "counsel's conduct is given deference and presumed reasonable," the petitioner must show that "no competent counsel would have taken the action that [the petitioner's] counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). Moreover, "[w]hen combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether 'there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.' " *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910-11 (11th Cir. 2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011)).

The prejudice prong requires the court to assess whether there is a substantial, rather than merely conceivable, likelihood of a different result. *See, e.g., Harrington*, 131 S. Ct. at 792 (citing *Strickland*, 466 U.S. at 693-94). For

sentencing, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.' " *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 453-54 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000)).

B

Two forensic psychologists—one called by each side—testified at the postconviction hearing. Mr. Jones's trial attorney also testified.

Dr. Robert Berland had tested Mr. Jones for the defense before the trial. Dr. Berland concluded Mr. Jones displayed symptoms of mental illness. Dr. Berland said Mr. Jones had a chronic psychotic disturbance, might suffer from an extreme mental or emotional disturbance, and might also suffer from antisocial personality disorder. Dr. Berland advised Mr. Jones's trial attorney not to conduct additional testing until more was known about whether Mr. Jones's illness was due to genetics or physical injury.

The State's forensic psychologist, Dr. Albert McClaren, testified that Mr. Jones was not seriously mentally ill but suffered from antisocial personality disorder.

Mr. Jones's trial attorney testified that he reviewed the information from Dr. Berland and records from the Department of Corrections. The records indicated

that Mr. Jones displayed antisocial behavior.  The attorney testified that he did not

observe mental-health issues in his interactions with Mr. Jones.  He also testified

that he was concerned that Mr. Jones had traces of cocaine in his body on the night

of the murder.  The attorney believed that a jury would be less forgiving of a

person who committed a murder while taking illegal drugs.  But by the time of the

postconviction hearing, the attorney did not fully remember his analysis of whether

to present mental-health evidence.

The state postconviction court found that the attorney sufficiently

investigated the benefits and potential setbacks of presenting mental-health

evidence during the penalty phase and "made a reasoned, informed and

professional decision" not to do so.  First Order on Postconviction Mot. at 10, R. 6-

935 (Tab II).

The Florida Supreme Court disagreed, concluding that the attorney

displayed "a serious lack of effort" that was "unreasonable under the prevailing

professional norms."  *Jones v. State* (*Jones II*), 998 So. 2d 573, 583 (Fla. 2008).

The court said Mr. Cummings's "own testimony makes evident that the decision to

abandon mental health mitigation was not informed or strategically made after

considering the alternatives."  *Id.*  But the court concluded that the only diagnosis

that both Dr. Berland and Dr. McClaren agreed on was antisocial personality

disorder.  The court concluded that mental-health evidence would have been "more

harmful than helpful." *Id.* at 585. Further, the court concluded that even with mitigating mental-health evidence, Mr. Jones would not have overcome the substantial aggravating factors that produced the death sentence. *See id.* at 585-86.

The Eleventh Circuit has repeatedly recognized that a diagnosis of antisocial personality disorder can be an aggravating—rather than a mitigating—factor. *See, e.g.*, *Kokal v. Sec'y, Dep't of Corr.*, 623 F.3d 1331, 1349 (11th Cir. 2010); *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1248 (11th Cir. 2010); *Cummings v. Sec'y for the Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009). And presenting mental-health evidence might have led to introduction of evidence that Mr. Jones had used cocaine on the night of the murder, another potentially harmful effect. *See Kokal*, 623 F.3d at 1349-50.

Even if the Florida Supreme Court correctly concluded that the attorney's performance was deficient—not an obvious proposition, especially given the potential harmfulness of the mental-health evidence—the conclusion that Mr. Jones suffered no prejudice was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. Mr. Jones is not entitled to relief on this claim.

## C

Mr. Jones had a difficult family background, a mitigating circumstance. During the penalty phase, Mr. Jones and his older sister, a police officer, so

testified.  Mr. Jones's sister said their father abused their mother and abandoned the family.  Mr. Jones was young and had difficulty coping.  Eventually, their mother remarried.  The new stepfather was an alcoholic who also abused the mother.  The mother became an alcoholic.  Mr. Jones never accepted the stepfather.  Eventually the mother stabbed the stepfather to death.  The mother was incarcerated for a few years.  Ms. Stewart testified that Mr. Jones changed for the worse after their mother went to prison.  Mr. Jones became difficult to control and started getting into trouble.

Mr. Jones also testified about his difficult childhood.  He dropped out of school and drank.  He got into trouble when he drank.  At the time of the wreck on the night of the murder, Mr. Jones's blood alcohol level exceeded 0.26%.

Mr. Jones now asserts his attorney should have introduced the testimony of additional family members. At the postconviction hearing, the attorney, who had met with various family members, explained the decision to call the sister and no others.  The attorney said the sister "was the most articulate" and had the strength to explain the family history "without getting too emotional."  The attorney also said that because she was a police officer, "the State could not attack her credibility."  Postconviction Evid. Hrg. Tr. at 91 (Tab HH).

At the postconviction hearing, Mr. Jones presented testimony of Mr. Jones's former football coach, other family members, and a former girlfriend.  They

provided testimony about Mr. Jones's childhood, their positive interactions with him, and knowledge of his struggles.

The postconviction court found that the attorney's decision to call only the sister was reasonable, consciously-made, and not deficient. The Florida Supreme Court agreed that the attorney made a strategic decision after considering alternatives. *See Jones II*, 998 So. 2d at 586. And the court concluded that even if the attorney's performance was deficient, it did not affect the outcome.

When evidence at a postconviction hearing provides more details and different examples but tells "largely the same story," a state court can reasonably conclude that the evidence is cumulative. *See Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1266-67 (11th Cir. 2012) (citing cases). This is true so long as "the basic story of [the petitioner's] troubled, abusive childhood was . . . known to the . . . jury." *Id.* at 1266 (internal quotation marks omitted).

Here the evidence at the penalty phase adequately presented the basic story of Mr. Jones's family background. The attorney reasonably chose to present the evidence through Mr. Jones and his sister, a police officer. The decision not to present additional family-background evidence was not deficient and caused no prejudice. The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. And the rejection of this claim was not based on an unreasonable

determination of the facts in light of the evidence presented in the state-court

proceeding.  Mr. Jones is not entitled to relief on this claim.

XI

A death sentence may be imposed only when there are aggravating factors

that narrow the class of individuals eligible for a death sentence.  The requirement

derives from *Furman v. Georgia*, 408 U.S. 238 (1972).  There the Supreme Court

held that a death sentence may not be imposed under procedures that create a

substantial risk that the punishment will be inflicted in an arbitrary and capricious

manner.

An aggravating factor must provide "a meaningful basis for distinguishing

the few cases in which [the penalty] is imposed from the many cases in which it is

not."  *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (internal quotation marks

omitted).  An aggravating factor "must genuinely narrow the class of persons

eligible for the death penalty and must reasonably justify the imposition of a more

severe sentence on the defendant compared to others found guilty of murder."

*Zant v. Stephens*, 462 U.S. 862, 877 (1983).  A vague aggravator is invalid because

it "creates the risk that the jury will treat the defendant as more deserving of the

death penalty than he otherwise might be by relying on the existence of an illusory

circumstance."  *Stringer v. Black*, 503 U.S. 222, 235 (1992).  Neither the jury nor

the sentencing judge may weigh an invalid aggravator that has not been narrowed

by a proper limiting construction. *See Espinosa v. Florida*, 505 U.S. 1079, 1081-82 (1992).

Mr. Jones contends that two aggravators relied on as a basis for his death sentence are invalid. The first was that the murder was "especially heinous, atrocious, or cruel." The second was that the murder was committed in connection with another felony—robbery.

A

The words "heinous, atrocious, or cruel," standing alone, would be impermissibly vague. But here the words did not stand alone. The jury instructions said the "especially heinous, atrocious, or cruel" aggravator applied if:

> The crime for which the Defendant is to be sentenced was especially heinous, atrocious or cruel. "Heinous" means extremely wicked or shockingly evil. "Atrocious" means outrageously wicked or vile. "Cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. *The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional facts that show that the crime was conscienceless or pitiless and was unnecessarily tortu[r]ous to the victim.*

Trial Tr. 997:23-998:8 (Tab S) (emphasis added).

The instruction tracked the Florida Supreme Court's narrowing construction of the "heinous, atrocious, or cruel" aggravator. *See State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973) ("What is intended to be included are those capital crimes . . . apart from the norm of capital felonies—*the conscienceless or pitiless crime which is*

*unnecessarily torturous to the victim.*") (emphasis added), *superseded by statute on other grounds as stated by State v. Dene*, 533 So. 2d 265 (Fla. 1988). The Eleventh Circuit has recognized a state's authority to adopt such a narrowing construction. *See Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1316 (11th Cir. 2005).

The United States Supreme Court upheld this aggravator, defined as set out in these jury instructions, in *Proffitt v. Florida*, 428 U.S. 242, 255-56 (1976) ("We can not say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases.").

The Florida Supreme Court rejected this claim on the merits. The decision was correct. Mr. Jones is not entitled to relief on this claim.

## B

Mr. Jones also challenges the aggravator for commission of the murder in connection with another felony. The Florida Supreme Court rejected the challenge on procedural grounds—the issue was not raised in the trial court—and on the merits.

The ruling was plainly correct. On the merits, the law of the circuit holds the aggravator constitutional. *Mills v. Singletary*, 161 F.3d 1273, 1286-87 (11th Cir. 1998). Mr. Jones is not entitled to relief on this claim.

XII

Mr. Jones claims that the "heinous, atrocious, or cruel" aggravator, even if not impermissibly vague, was improperly applied on the facts of this case. Mr. Jones says that if applicable on these facts, the aggravator does not adequately perform the required narrowing function.

The Florida Supreme Court rejected this claim on the merits. The court concluded that Mr. Young "experienced a great deal of pain and terror as he attempted to fend off his killer prior to being drowned." *Jones v. State (Jones I)*, 648 So. 2d 669, 679 (Fla. 1994). The court noted that Mr. Young's arm and ribs were fractured before he died. And the court cited Mr. Jones's own account of the murder, as told to Mr. Prim: Mr. Jones "pushed [Mr. Young's] head into the water until it stopped popping up." *Id.*

The Florida Supreme Court has consistently upheld this aggravator for beating deaths. Physical acts of violence that precede the fatal injury can be enough, even when it is not clear how long the victim was conscious during the assault. *See, e.g.*, *Douglas v. State*, 878 So. 2d 1246, 1261 (Fla. 2004) (citing cases and holding that the "heinous, atrocious, or cruel" aggravator applies if the victim is conscious for part of a brutal beating and aware of impending death); *Belcher v. State*, 851 So. 2d 678, 683-84 (Fla. 2003) (citing cases and holding that this aggravator was reasonably applied even though the victim was conscious for only

30 seconds to one minute before death because there was a struggle and the victim was aware of her impending death); *Beasley v. State*, 774 So. 2d 649, 669-70 (Fla. 2000) (holding that the length of consciousness and the fear and emotional strain on the victim impact application of this aggravator); *Rutherford v. State*, 545 So. 2d 853, 856 (Fla. 1989) (holding that the aggravator was reasonably applied when a victim with a number of injuries was drowned).

The key inquiry is whether the victim suffered pain and terror from the attack. Cases involving near-instantaneous death or unconsciousness generally do not support the aggravator. *See Proffitt v. Wainwright*, 685 F.2d 1227, 1263-64 (11th Cir. 1982) (comparing cases); *Douglas*, 878 So. 2d at 1261; *Beasley*, 774 So. 2d at 670 (noting the "common-sense inference" that a wide variety of wounds around the body, including defensive wounds, indicates that the victim suffered pain and emotional trauma from the attack). In arguing against application of this aggravator, Mr. Jones cites cases in which the victim was shot or stabbed. None of the cases involved a victim with significant premortem defensive wounds who was drowned or strangled.

In sum, substantial evidence supported the reasonable inference that Mr. Young suffered great pain and the terror of impending death. The Florida Supreme Court's ruling that the jury and sentencing judge properly applied this aggravator was correct. Mr. Jones is not entitled to relief on this claim.

XIII

Mr. Jones claims that in weighing the aggravating and mitigating factors, the trial court gave inadequate weight to two mitigators: intoxication and family background. The Florida Supreme Court rejected the claim, noting that the trial court found both mitigators present and concluding that "the weight to be given [to the mitigators] was within the trial court's discretion." *Jones I*, 648 So. 2d at 679-80.

A court must allow a defendant facing the death penalty to offer, and the court may not refuse to consider, any relevant mitigating evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982); *Lockett v. Ohio*, 438 U.S. 586, 603-04 (1978). But the process of weighing aggravating and mitigating factors is a matter of discretion and judgment. So long as the discretion is exercised within the bounds of the Supreme Court's death-penalty jurisprudence, "a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006); *accord Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular

weight."); *Magwood v. Smith*, 791 F.2d 1438, 1449 (11th Cir. 1986) ("[A] federal

habeas corpus court will not re-evaluate the *weight* accorded to particular

aggravating and mitigating factors. This determination is left to state courts,

provided the death-penalty statute and sentencing hearing meet relevant

constitutional requirements.").

The essence of Mr. Jones's claim is that the reasons stated by the trial court

in discounting his mitigation evidence were not appropriate.

Mr. Jones says his high level of intoxication—a blood alcohol level

exceeding 0.26 percent—showed that his capacity was severely diminished. But

the Eleventh Circuit has frequently recognized that intoxication can cut both ways.

*See, e.g.*, *Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001). And a reasonable

jury or sentencing judge could have found Mr. Jones's intoxication less mitigating

based on Mr. Jones's admission that "[w]hen I drink, I get in trouble." Trial Tr.

967:16-968:8 (Tab P). The record confirms the assessment; Mr. Jones had prior

alcohol-related convictions for attempted robbery in 1976, robbery in 1981, two

counts of robbery with a firearm in 1982, and robbery with a firearm and

kidnapping in 1983. In these circumstances, the trial court was not required to give

Mr. Jones's intoxication greater mitigating weight.

Mr. Jones says the trial court inappropriately discounted the mitigating

weight of Mr. Jones's difficult childhood and family background on two grounds:

that the background was remote in time from the murder and that Mr. Jones's apparently well-adjusted sisters came from the same background. A reasonable jury or sentencing judge could conclude that one's background becomes a less pervasive influence as time passes and that the background may appropriately be analyzed in comparison to others who shared the same background but made different choices.

The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. And the rejection of this claim was not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. *See Johnson v. Wainwright*, 778 F.2d 624, 631 (11th Cir. 1985) ("Where the issue is one of fact . . . we accept the state courts' decisions about the weight of mitigating evidence absent fundamental error."). Mr. Jones is not entitled to relief on this claim.

## XIV

Mr. Jones claims that the jury instructions improperly shifted to the defense the burden of showing that mitigators outweighed aggravators and that his attorney rendered ineffective assistance by failing to object in the trial court or raise the issue on appeal. This has been labeled the "equipoise" issue. *Kansas v. Marsh*,

548 U.S. 163, 169-72 (2006).  The issue is the proper sentence when aggravating and mitigating factors are in equipoise.

The instructions told the jury that if it found no aggravators, its recommendation would be for a life sentence.  The instructions continued: "Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances."  Trial Tr. 998:15-999:5 (Tab S).

The Florida Supreme Court held this claim procedurally defaulted because it was not raised at trial or on direct appeal.  Mr. Jones in fact objected at trial but did not pursue the issue on direct appeal.  Mr. Jones thus procedurally defaulted the claim that the instruction was improper.

The claim of ineffective assistance at trial fails because Mr. Jones's attorney objected to the instruction.  An attorney does not render ineffective assistance when the attorney raises an issue but suffers an adverse ruling for reasons unrelated to any deficient performance.

The claim of ineffective assistance on appeal was never properly presented in state court.  The claim thus has not properly been exhausted and cannot now be pursued here.  And in any event, the claim fails on the merits.  As set out above, an ineffective-assistance claim requires a showing of deficient performance and prejudice.  An assertion that an attorney rendered ineffective assistance by failing

to raise a claim on appeal can succeed only if " 'the neglected claim would have a reasonable probability of success on appeal.' " *Philmore v. McNeil*, 575 F.3d 1251, 1265 (11th Cir. 2009) (quoting *Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991)).  Any appeal on the equipoise issue would have failed based on the Florida Supreme Court's settled law on this issue.  *See Jones II*, 998 So. 2d at 589 (citing *Miller v. State*, 926 So. 2d 1243, 1257 (Fla. 2006)); *see also, e.g.*, *Arango v. State*, 411 So. 2d 172, 174 (Fla. 1982).

So Mr. Jones defaulted the claim that the equipoise instruction was improper.  The claim of ineffective assistance at the trial level fails on the merits.  The claim of ineffective assistance on appeal is procedurally defaulted and fails on the merits.  Mr. Jones is not entitled to relief on these claims.

And the claims fail for a more fundamental reason as well.  In *Walton v. Arizona*, 497 U.S. 639, 650 (1990), the plurality would have upheld an Arizona statute that "impose[d] on defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency."  In *Kansas v. Marsh*, 548 U.S. 163, 173 (2006), the Court said *Walton* "held that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances."

Both before *Walton* and since, the Eleventh Circuit has routinely rejected equipoise claims of the kind Mr. Jones now asserts. *See Henderson v. Dugger*, 925 F.2d 1309, 1317-18 (11th Cir. 1991); *Bertolotti v. Dugger*, 883 F.2d 1503, 1524-25 (11th Cir. 1989). These cases, and Mr. Jones's case, are unlike *Jackson v. Dugger*, 837 F.2d 1469, 1473-74 (11th Cir. 1988), which disapproved an *explicit* jury instruction that once an aggravating circumstance was found, death was the presumed penalty.

The decisions rejecting claims on the equipoise issue may or may not ultimately survive. *See Ring v. Arizona*, 536 U.S. 584 (2002) (holding that a fact that makes a defendant eligible for the death penalty must, if not admitted, be proved to a jury beyond a reasonable doubt). But *Ring* is not retroactively applicable to cases on collateral review. *See Schriro v. Summerlin*, 542 U.S. 348 (2004). And under the law of the circuit, *Ring* does not of its own force invalidate by implication prior decisions like those addressing the equipoise issue; if those decisions are to be overruled, the Supreme Court, not the Eleventh Circuit or a district court, will do the overruling. *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263-64 (11th Cir. 2012).

The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

# XV

Mr. Jones claims that advising the jury that its role in sentencing was advisory violated the rule of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Mr. Jones claims that his trial attorney rendered ineffective assistance by failing to object.

The Florida Supreme Court held this claim procedurally defaulted and unfounded on the merits. The merits ruling was plainly correct.

Under *Caldwell*, a sentencing jury cannot be told its role is advisory when it is not. The difference in Florida is that the jury's role *is* advisory; the instruction telling the jury this is correct. Accurately so advising the jury is not unconstitutional. *See, e.g.*, *Johnson v. Singletary*, 162 F.3d 630, 643 (11th Cir. 1998); *Provezano v. Singletary*, 148 F.3d 1327, 1334 (11th Cir. 1998); *Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997).

To be sure, the Supreme Court's more-recent decision in *Ring* may cast doubt on the constitutionality of an advisory jury. *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263-64 (11th Cir. 2012) (setting out the arguments on both sides of this issue but concluding that older Supreme Court authorities remain binding until the Supreme Court says otherwise). The issue makes no difference here, because, as set out above, *Schriro* held that *Ring* is not retroactively applicable to cases on collateral review.

The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

## XVI

When a district court denies a § 2254 petition, it must simultaneously grant or deny a certificate of appealability. The petitioner must obtain a certificate of appealability as a prerequisite to an appeal. *See* 28 U.S.C. § 2253(c)(1). A court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). *See Miller-El v. Cockrell,* 537 U.S. 322, 335-38 (2003) (explaining the meaning of this term); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (same); *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000) (setting out the standards applicable to a § 2254 petition on the merits). As the Court said in *Slack*:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Slack*, 529 U.S. at 483-84 (quoting *Barefoot*, 463 U.S. at 893 n.4). In order to obtain a certificate of appealability when dismissal is based on procedural grounds,

a petitioner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* at 484.

Mr. Jones has made the required showing for two issues. The issues are shackling as addressed in section VI and failure to present mental-health mitigation evidence as addressed in section X.B. This order grants a certificate of appealability on these two issues.

XVII

For these reasons,

IT IS ORDERED:

1.      The petition for a writ of habeas corpus is denied with prejudice. The clerk must enter judgment and close the file.

2.      A certificate of appealability is granted on these two issues:

(a)      Whether the shackling claim was properly denied without an evidentiary hearing in state or federal court.

(b)      Whether the mental-health mitigation claim was properly denied.

3.      A certificate of appealability is denied on all other issues. If Mr. Jones wishes to be heard further on whether a certificate of appealability should be

granted on any other issue, he may file an appropriate motion, and the issue will be

reconsidered de novo.  But Mr. Jones need not file such a motion as a prerequisite

to seeking a certificate from the Eleventh Circuit; this order is a definitive ruling

denying a certificate on any other issue.

SO ORDERED on October 1, 2013.

s/Robert L. Hinkle
United States District Judge